# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                                                             **Case No. 13-CR-225**

**STEPHEN IVORY**
    **Defendant.**

## DECISION AND ORDER

On August 27, 2013, a Milwaukee police officer conducted a pat-down of defendant Stephen Ivory, discovering a firearm. The officer arrested defendant for carrying a concealed weapon ("CCW") under state law, and defendant was later convicted of that offense in Milwaukee County Circuit Court, receiving a sentence of 180 days in jail. Meanwhile, on November 19, 2013, the government obtained an indictment charging defendant with making a false statement in connection with the purchase of a firearm (count one), contrary to 18 U.S.C. § 922(a)(6), and possessing a firearm as an unlawful drug user (count two), contrary to 18 U.S.C. § 922(g)(3). Count one pertained to defendant's attempted purchase of a firearm from Cabela's, a federal firearms dealer, on November 2, 2011, while count two pertained to the firearm seized from defendant's person on August 27, 2013.

On May 6, 2014, defendant filed a motion to suppress all evidence and derivative evidence, including all of his statements, obtained as a result of the search and seizure by Milwaukee police on August 27, 2013. The following day the government moved for leave to dismiss count two, which I granted on May 21, 2014. On June 12, 2014, the magistrate judge handling pre-trial proceedings in this case conducted an evidentiary hearing on the motion to

suppress. The parties did not at that hearing discuss the impact of the dismissal of count two or otherwise address the scope of the suppression order sought. On August 5, 2014, the magistrate judge issued a recommendation that the motion be denied, finding that defendant consented to the pat-down. Defendant objected, and I held a de novo hearing on October 20, 2014, at which the parties again did not address the scope of the suppression order sought. On November 4, 2014, I granted the motion, finding that defendant did not consent and that the police unlawfully searched his person.

At a November 20, 2014, status conference, the government requested and I granted permission to brief the scope of suppression. In its submission, the government notes that the only pending charge is count one, which alleges that defendant made a false statement to a federally licensed firearms dealer on November 2, 2011, nearly two years prior to the police encounter that was the subject of the evidentiary hearings. The government indicates that in order to prove count one it would submit the ATF Form 4473 defendant completed on November 2, 2011, in which he represented that he was not a fugitive from justice, as well as evidence showing that at the time defendant made this statement there was a warrant out for his arrest for failure to appear in Clark County, Indiana on a marijuana possession case emanating from a March 23, 2011 traffic stop. The government contends that this evidence need not be suppressed based on my finding of an unlawful search on August 27, 2013. Defendant counters that the government pursued this evidence only because of statements he made following his unlawful arrest on August 27, 2013, and that the government cannot establish any independent source that would have led them to this evidence. The matter is fully briefed and ready for decision.

## I.  FACTS

In my November 4 order, I summarized the facts regarding the August 27 search and seizure as follows:

> On August 27, 2013, Milwaukee police responded to a fatal shooting in the area of 27th and Burleigh Streets, shutting down traffic, securing the scene, and canvassing the area to identify witnesses and suspects.  During the canvass, officers secured a Chicago Subs shop, identifying six witnesses, including defendant.  Three officers were stationed inside the shop to make sure no one came in or left, to ensure that the witnesses did not taint their statements by conferring, and to protect the witnesses' identities.  The witnesses remained in the shop for between 30 and 60 minutes.  The scene commander, Sgt. Wesam Yangham, secured squad cars so the witnesses could be questioned separately.  Five of the six witnesses were questioned in squads, the sixth inside the sub shop.
>
> After about an hour, Yangham told Officers Jose Ramirez and Chad Boyack to take defendant to their squad car for an interview.  Ramirez approached defendant, who was standing outside the sub shop holding a bag of food, and told defendant to follow him to the car.  Ramirez pointed out the car, and defendant walked in front of Ramirez towards it.  Once they arrived at the squad car, Ramirez told defendant that before he placed defendant in the squad car he would "need to pat him down just for personal procedures."  Defendant said something to the effect of "okay," but Ramirez could not remember his exact words.  Ramirez tapped defendant's elbows, defendant put his hands up, and Ramirez proceeded to pat him down, discovering a firearm in his waistband.  Defendant was not at the time of the pat-down a suspect, just a witness, and the officers had no reason to believe that he was armed or dangerous.

(R. 41 at 1-2, internal citations and footnotes omitted.)

According to the supplemental materials presented by the parties,[1] based on the discovery of the firearm officers arrested defendant for CCW and took him into custody at approximately 12:40 a.m.  At about 5:20 a.m., a Milwaukee detective questioned defendant about the gun found on his person and the shooting he had witnessed.  At approximately 1:15

---

[1] Neither side asks for an additional evidentiary hearing on the scope of suppression issue.

3

p.m., Milwaukee Detective Caballero (an ATF task force officer) and ATF Special Agent Adamson interviewed defendant again. Adamson advised defendant of his Miranda rights, and defendant agreed to talk. (R. 44-1 at 1.) During the interview, defendant indicated that he purchased the firearm he had been caught with the previous night at a gun show in June of 2013. Defendant stated that the only other time he tried to purchase a firearm was in 2011 or 2012 when he tried to buy a .40 caliber Sigma from Cabela's. Defendant stated that he was denied that firearm because he was considered a fugitive from justice. He explained that in March of 2010 during a trip to Atlanta he was caught with a sack of weed in Kentucky;[2] he never took care of the case, and it turned into a warrant. The agents also questioned defendant about his drug use, and he stated that he had been smoking marijuana since the age of 18, last using a couple days ago for a friend's birthday. (R. 44-1 at 2.)

Based on this information, ATF agents conducted a follow up investigation regarding defendant's prior involvement with firearms. On August 28, 2013, at about 6:45 p.m., Adamson and Cabellero met with defendant's mother, Jillandra Sargent, and she stated that defendant had previously applied to purchase a firearm but was denied due to a warrant in Indiana for marijuana. (R. 44-2 at 1.) The agents also spoke to defendant's step-father regarding defendant's marijuana use. (R. 44-2 at 2.) On September 4, 2013, Adamson obtained firearm transaction reports dated November 2, 2011, related to defendant's attempted purchase of a firearm from Cabela's. On September 5, 2013, Adamson obtained information from the State of Wisconsin Handgun Hotline regarding defendant's November 2011 denial for being a fugitive from justice. (R. 44-3.) Finally, agents obtained information from Clark County, Indiana about

---

[2]It was actually Indiana.

4

defendant's marijuana case, including the paperwork defendant signed at the time of his release.

## II.  DISCUSSION

The government concedes suppression of the firearm and defendant's post-arrest statements based on my November 4 order.  However, it contends that I should not suppress the additional evidence it obtained from Cabela's, the State of Wisconsin, and the Indiana court in the week following defendant's arrest.

**A.    Applicable Legal Standards**

The exclusionary rule applies to the direct and indirect products of a Fourth Amendment violation.  See Wong Sun v. United States, 371 U.S. 471, 484 (1963).  The Supreme Court has declined to hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police.  Id. at 487-88.  "Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  Id. at 488 (internal quote marks omitted).   The government bears the burden of showing attenuation. See United States v. Conrad, 673 F.3d 728, 733 (7th Cir. 2012); United States v. Fialk, 5 F.3d 250, 252 (7th Cir. 1993).

The Supreme Court has identified a number of factors relevant to this determination, including (1) the temporal proximity of the illegal conduct to the discovery of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct.  United States v. Robeles-Ortega, 348 F.3d 679, 681 (7th Cir. 2003) (citing Brown

v. Illinois, 422 U.S. 590, 603-04 (1975)). Because there is no bright-line test for temporal proximity, it is often helpful to consider this factor in conjunction with the alleged intervening circumstances. See, e.g., United States v. Reed, 349 F.3d 457, 464 (7th Cir. 2003) (citing United States v. Fazio, 914 F.2d 950, 958 (7th Cir. 1990)).

The "type of intervening events that serve to attenuate official misconduct are those that sever the causal connection between the illegal arrest and the discovery of the evidence." Id. Examples include a confession made several days after the illegal arrest, preceded by arraignment and release from custody, id. (citing Wong Sun, 371 U.S. at 491); the discovery of other incriminating evidence implicating the defendant and causing the defendant to confess spontaneously, id. (citing Rawlings v. Kentucky, 448 U.S. 98, 108-09 (1980)); the defendant freely agreeing to speak to the police at a site away from the scene of the illegal arrest, driving his own vehicle to the meeting, id. (citing Fazio, 914 F.2d at 958 & n.2); a proper arrest on unrelated charges following the initial illegal arrest, id. (citing United States v. Green, 111 F.3d 515, 521 (7th Cir. 1997)); and the defendant's subsequent release from custody, appearance before a magistrate judge, discussions with counsel, or subsequent convictions on unrelated charges, id. (citing United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1300 (9th Cir. 1988)).

The third factor (purpose and flagrancy of the official misconduct) is considered the most important because it is tied directly to the rationale underlying the exclusionary rule – deterrence of police misconduct. Id. at 464-65. Purposeful and flagrant misconduct is not limited to situations where the police act in bad faith or in a threatening or coercive manner. Id. at 465 (citing Dunaway v. New York, 442 U.S. 200, 218-19 (1979)). For instance, unwarranted detentions following illegal seizures may demonstrate the type of purposeful and flagrant conduct the exclusionary rule was designed to prevent. Id. (citing United States v.

6

Ienco, 182 F.3d 517, 528 (7th Cir. 1999)); see also id. ("In fact, the Brown Court recognized that 'the quality of purposefulness' can be demonstrated when the arrest, in design and execution, is investigatory in nature."). Because the court considers both the conduct before and after the constitutional violation, actions undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it would lead to a confession or other useful evidence may also establish purposefulness. See Conrad, 673 F.3d at 735.

**B.     Analysis**

    **1.     Timing**

The government notes that more than 12 hours elapsed between the time of the pat-down and defendant's voluntary, Mirandized statement to the ATF agents. However, the government has conceded suppression of this statement and, in any event, the Supreme Court has held that the mere fact that the defendant waived Miranda and spoke voluntarily does not establish attenuation. See Taylor v. Ala., 457 U.S. 687, 690 (1982) ("In Brown and Dunaway, this Court firmly established that the fact that the confession may be 'voluntary' for purposes of the Fifth Amendment, in the sense that Miranda warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest."). The government further notes that more than a week passed between the illegal arrest and the acquisition of the documents from third parties. See Conrad, 673 F.3d at 733 (citing cases finding time lapses as short as a few minutes sufficient). However, without any consideration of the intervening events, the mere passage of time tells me little. For instance, in Rawlings, which found attenuation after 45 minutes, the Court stated: "Although under the strictest of custodial conditions such a short lapse of time might not suffice to purge the initial taint, we believe it necessary to examine the

7

precise conditions under which the [defendants] were detained." 448 U.S. at 107; see also United States v. Parker, 469 F.3d 1074, 1078 (7th Cir. 2006) (finding attenuation where just a few minutes elapsed but focusing on the intervening circumstances).

### 2. Intervening Factors

The government argues that there were several intervening events here – defendant was moved from the scene of the unlawful arrest to a district station, then to the downtown processing center, where he waived his Miranda rights and provided a voluntary statement; the following day, investigators interviewed defendant's mother, who indicated that defendant had been denied a firearm because of an Indiana marijuana case; and the following week investigators obtained from third parties documents related to the attempted purchase. The government contends that these events created a substantial causal break from the official misconduct.

While it is true that defendant made the statement to ATF agents in a location different from the site of the unlawful arrest, he remained in custody the entire time; this is not a case where he was released, then transported himself to the police station to make a statement. Cf. Fazio, 914 F.2d at 958 ("It must be noted that at no time during Mr. Fazio's entire encounter with police was he in custody. Moreover, he freely agreed to speak with police at a site removed from the restaurant and then drove his own vehicle to the meeting."). And, as discussed above, neither the voluntariness of the statement nor the provision of Miranda warning are alone sufficient to purge the primary taint.

The government fails to explain how any of the later events broke the causal connection between the unlawful arrest and the evidence that petitioner made a false statement to Cabela's. The record shows that the ATF took advantage of defendant's unlawful detention

8

to question him again, this time regarding potential federal offenses, including his previous attempts to acquire firearms and his use of marijuana (which made his firearm possession a federal offense). Based solely on defendant's admission that he attempted to acquire a firearm from Cabela's in 2011 and that he smoked marijuana, the agents questioned defendant's mother about his attempt to acquire a gun and his drug use. Based solely on these statements, the agents then acquired the documents relating to defendant's attempt to purchase the gun from Cabela's.[3] This is not a case in which the police acquired new, material information from third parties following the illegal action. Cf. United States v. Carter, 573 F.3d 424 (7th Cir. 2009) (finding attenuation where the police learned the suspect's name both from an illegal search and from a witness who spoke to investigators after the illegal search, which they then used to assemble a photo array from which the victim identified the defendant as the robber). Rather, they merely obtained records confirming what they already knew based on petitioner's inadmissible post-arrest statement.

In this sense, the present case resembles Silverthorne Lumbar Co. v. United States, 251 U.S. 385 (1920). In Silverthorne, the government unlawfully seized papers from the defendants' office, then attempted to subpoena the same papers after the court ordered their return. The Court rejected the attempt:

> The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object

---

[3]The information from defendant's mother about the denied purchase essentially confirmed what the ATF already knew. She did not identify Cabela's as the firearms dealer from which defendant tried to buy a gun.

9

> of its pursuit by doing the forbidden act. Weeks v. United States, 232 U. S. 383, to be sure, had established that laying the papers directly before the grand jury was unwarranted, but it is taken to mean only that two steps are required instead of one. In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. 232 U.S. 393. The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

Id. at 391-92. In present case, the fact that the ATF could have lawfully inspected the firearm transaction documents, which Cabela's was required to maintain, does not establish attenuation when the only reason the government had any interest in those papers was because of information it learned by violating the Constitution. The government makes no claim that, absent defendant's August 27, 2013 arrest and statement, the ATF would have inevitably reviewed the November 2011 transaction records from Cabela's, discovering defendant's alleged false statement. Nor does it matter that the documents the government wants to use in this case came from third parties. In Wong Sun, the Court ordered suppression of evidence obtained from a third party when the police were led to that party based solely on statements the defendant made after an unlawful arrest. 371 U.S. at 487-88.

### 3. Purpose and Flagrancy

The government argues that the official misconduct was neither purposeful nor flagrant. Ramirez patted defendant down for officer safety, not as a ruse to develop evidence. The government further notes that I did not find a flagrant violation of the Fourth Amendment but rather that the government failed to meet its burden of proving consent as opposed to mere acquiescence.

The government's focus is too narrow. Even if Officer Ramirez did not act in bad faith,

I must also consider the events following the unlawful arrest. At the time of his statement to the ATF, a Milwaukee detective had already questioned defendant about the CCW offense for which he had been arrested and the shooting he had witnessed. The additional interview by the ATF agents was designed to acquire further evidence to support possible federal charges. As the Seventh Circuit explained in Reed, 349 F.3d at 465-66:

> [T]he district court also must examine whether the actions were undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it would lead to a confession or other useful evidence. Such actions would undermine the purpose of the Fourth Amendment, and therefore are relevant to this analysis that ultimately examines whether suppression is necessary for purposes of deterrence or judicial integrity.

Finally, citing Hudson v. Michigan, 547 U.S. 586 (2006); New York v. Harris, 495 U.S. 14 (1990); and Segura v. United States, 468 U.S. 796 (1984), the government argues that suppression would not serve the purposes of the exclusionary rule. These cases are distinguishable.

In Hudson, the Court held that violation of the "knock and announce" rule in executing a search warrant did not require suppression of evidence. The Court first noted that "the constitutional violation of an illegal manner of entry was not a but-for cause of obtaining the evidence. Whether that preliminary misstep had occurred or not, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house." Id. at 592. No such claim can be made in this case, for the constitutional violation here led directly to the discovery of the additional evidence.[4] The Hudson Court further found that the purposes of the knock and announce rule (protection of safety, property, and dignity)

---

[4] I acknowledge that but-for causation is only a necessary, not a sufficient, condition for suppression. Id.

11

would not be served by suppression of evidence. However, the Court has long approved the suppression of direct and indirect evidence resulting from an unlawful search and seizure. See, e.g., Wong Sun, 371 U.S. at 484, 487-88.

In Harris, the police obtained probable cause that the defendant committed a murder, went to his apartment, entered and arrested him without a warrant, contrary to Payton v. New York, 445 U.S. 573 (1980) (holding that the Fourth Amendment prohibits warrantless entry into the home to make a felony arrest). The defendant sought suppression of a Mirandized statement he later made at the station house, but the Court held that the rationale for the Payton rule – respect for the sanctity of the home – did not support suppression. "Nothing in the reasoning of that case suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house." 495 U.S. at 18. The Court stressed that because the officers had probable cause to arrest Harris for a crime, he was not unlawfully in custody when he was removed to the station house, given Miranda warnings, and allowed to talk. Id. The Court distinguished Brown v. Illinois and its progeny, for in those cases the police lacked probable cause for the arrest and the challenged evidence was unquestionably the product of the wrongful detention. Id. at 18-19. This case is more like Brown than Harris. The police seized defendant without reasonable suspicion or probable cause, and the evidence subsequently obtained flowed directly from that detention.

Segura was an independent source case. There, the police unlawfully entered the defendant's apartment, but then obtained a warrant based on information known to them before the unlawful entry. The Court stated:

No information obtained during the initial entry or occupation of the apartment

was needed or used by the agents to secure the warrant. It is therefore beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged. This evidence was discovered the day following the entry, during the search conducted under a valid warrant; it was the product of that search, wholly unrelated to the prior entry. The valid warrant search was a "means sufficiently distinguishable" to purge the evidence of any "taint" arising from the entry. Had police never entered the apartment, but instead conducted a perimeter stakeout to prevent anyone from entering the apartment and destroying evidence, the contraband now challenged would have been discovered and seized precisely as it was here.

468 U.S. at 814 (internal citations and footnote omitted). In this case, the government has no such independent source. Indeed, it its reply letter, the government clarifies that the focus of its argument is that the ATF's acquisition of evidence from third parties was so attenuated from the Milwaukee police misconduct that exclusion of the evidence is not justified.[5] (R. 46.) For the reasons stated above, I cannot accept that contention.

### III. CONCLUSION

Defendant witnessed a crime. Rather than leaving the scene, he remained to talk to the police. The police then violated his Fourth Amendment rights by subjecting him to a suspicionless pat-down, and the ATF took advantage of his arrest on a state misdemeanor gun charge to further investigate him for federal firearms violations. The primary purpose of the exclusionary rule – to deter police overreaching – is served by suppressing not just the gun and defendant's statements but also the additional evidence the ATF obtained as a result of defendant's statements.

---

[5] I agree with the government that attenuation can be established without an independent source. The independent source doctrine is simply one way of avoiding suppression following illegal police action. See Segura, 468 U.S. at 805. However, for the reasons stated in the text, the government has not established attenuation.

**THEREFORE, IT IS ORDERED** that the documents obtained from Cabela's and the State of Wisconsin are suppressed.[6]

Dated at Milwaukee, Wisconsin, this 22nd day of December, 2014.

/s Lynn Adelman
LYNN ADELMAN
District Judge

---

[6] Defendant does not specifically seek suppression of the documents obtained from the Indiana court (see R. 45 at 5), and the government does not specifically indicate that it intends to use Sargent's statement (see R. 44 at 3, 5). I therefore do not specifically address these pieces of evidence in this decision.